IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| REGINA SUTTON, M.D. | § | |
| | § | |
| VS. | § | CA No. 6:23-cv-328 |
| | § | |
| THE PRUDENTIAL INSURANCE | § | |
| COMPANY OF AMERICA | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

This is a case involving a disability insurance policy and an insurance company's wrongful conduct related to that claim. It is an action for breach of contract, violations of the Texas Deceptive Trade Practices Act, violations of the Texas Insurance Code, and violation of the common law duty of good faith and fair dealing.

### Parties

1.     Plaintiff Regina Sutton, M.D. is a resident citizen of Anderson County, Texas.

2.     Defendant The Prudential Insurance Company of America ("Prudential") is a foreign corporation licensed to do business and doing business in the State of Texas. Prudential has appeared in this action.

### Jurisdiction and Venue

3.     This Court has jurisdiction over this civil action pursuant to 28 U.S.C. §1332(a)(1) since it is an action between citizens of two different states, and the matter in controversy exceeds $75,000. Dr. Sutton is a resident of Texas. Prudential is a

1

foreign corporation licensed to do business and doing business in the State of Texas.

## Summary

4.    Prudential is in the insurance business and sells various forms of life insurance, disability insurance, and health insurance. The promise of disability insurance is to provided income protection if an insured is disabled by injury or sickness.

5.    Implicit in the promise of the Prudential policy is that it will timely, fairly, and objectively adjust and pay a covered claim. If in doubt about the cause or nature of the insured's disability, Prudential implicitly promises to investigate the claim fairly and objectively and promptly pay if the claim meets the policy requirements.

6.    In September 2013, Dr. Sutton was badly injured in a car crash. Her injuries led to spinal injury, surgery complicated by the MRI, kidney damage, brain fog, stroke, broken right wrist, arm, hand, and neck.

7.    She submitted a long-term disability (LTD) claim pursuant to her participation in the Texas Medical Association Insurance Trust ("TMAIT"). Prudential issued and insured both Policies A and C. The Policies jointly paid $15,000 per month if she was disabled. She was assigned claim number 11908898, and Prudential approved the claim.

8.    Since then, Prudential has terminated the claim at least three times, forcing Dr. Sutton to submit at least six appeals.

9.    Prudential's most recent claim termination was January 18, 2022. Dr. Sutton appealed that denial twice. Prudential denied both, leading to this lawsuit.

2

## Factual Background

10.    Before 2013, Dr. Sutton was a general/trauma surgeon.

11.    General/Trauma Surgeon is classified under the Dictionary of Occupational Titles as Light with a Skill Level and Vocational Preparation level of 8. It is highly skilled work.

12.    In 2013, Dr. Sutton earned about $111,411 from January 1 – June 30.

13.    In 2013, Dr. Sutton earned about $141,314 from July 1 – December 30.

### Dr Sutton's Health History and Medical Treatment

14.    Dr. Sutton stopped working on September 2, 2013.

15.    She sustained cervical spine and lumbar injuries in a car crash on September 2, 2013, including a right C5 to C6 disc herniation. She underwent a C5 to C6 anterior cervical discectomy/fusion surgery on October 4, 2013.

16.    Due to post-traumatic low back pain with right lower extremity radicular pain, Dr. Sutton later underwent a right L5 to S1 epidural steroid injection on April 22, 2014. It did not provide a sustained benefit.

17.    In August 2014, Dr. Sutton underwent a failed T11 to 12 eXtreme Lateral Interbody Fusion (XLIF) surgery because of obliteration of the disc space by methyl methacrylate from the prior T12 vertebral body kyphoplasty surgical procedure.

18.    On November 4, 2014, Dr. Sutton had a right L5 to S1 laminectomy, facetectomy and foraminotomy surgery.

19.    On November 19, 2015 Dr. Sutton underwent an L5 to S1 microdiscectomy.

3

20.    Because of recurrent cervical pain unresponsive to conservative management, a posterior C4 to C5 laminectomy/multilevel fusion was performed on February 17, 2016. Dr. Sutton had continued cervical pain with right upper extremity radicular pain postoperatively.

21.    Because of her thoracolumbar kyphoscoliosis, Dr. Sutton underwent a T10 to L2 posterior interbody fusion with instrumentation on March 1, 2017. The purpose of the surgery was to remove super glue from the spinal cord without paralyzing her and to place spinal rods to stabilize her T12 spine fracture.

22.    After the surgery, she received an osteogenesis stimulator to promote healing of the posterior thoracolumbar spinal fusion.

23.    In 2018, more than a year after the T10 to L2 posterior fusion with instrumentation, Dr. Raabe opined that Dr. Sutton's continuing right- sided weakness may be secondary to sarcoidosis with underlying lymphadenopathy.

24.    On May 1, 2018, Dr. Sutton had a thoracic spinal CT scan, which showed posttraumatic changes at T12 with multilevel postoperative fusion changes and the lumbar spine CT scan revealing a prior T12 fracture with kyphoplasty change and T10 to L2 posterior fusion with orthopedic hardware.

25.    Dr. Sutton continued to suffer from these conditions and surgical recoveries throughout 2018 and 2019.

26.    In July 2019, Dr. Sutton suffered a stroke, which resulted in additional treatment with neurologist Dr. Paarth Shah for management of the stroke and vertigo for the period of August 23, 2019 through September 29, 2020. During this time and due

4

to her vertigo, she fell and broke her wrist, requiring intensive care and surgical intervention.

27.    In the last few months of 2019, Dr. Sutton began suffering from kidney dysfunction.

28.    On February 11, 2020, Dr. Sutton underwent an L4 to L5 and L5 to sacral (S)1 laminoforaminotomy surgery.

29.    Dr. Sutton's treating physicians document continued limitations and disabilities and the continued pain that requires pain management. Her multiple disorders have resulted in restrictions in activity and have significantly curtailed her ability to engage in any form of exertion.

30.    Dr. Sutton's treating physicians document these symptoms.

31.    Physicians have prescribed Dr. Sutton with multiple medications, including narcotic pain relievers, to address her multiple symptoms.

32.    However, Dr. Sutton continues to suffer from pain, discomfort, and limitations in functioning, as documented throughout her medical records.

33.    Dr. Sutton's documented pain is so severe that it impairs her ability to maintain the pace, persistence, and concentration required to maintain employment on a full-time basis, meaning an 8-hour day, day after day, week after week, month after month.

34.    Her medications cause additional side effects in the form of sedation and cognitive difficulties.

35. These impairments and their symptoms prevent Dr. Sutton from any work activities on a consistent basis.

## The Claim

36. Dr. Sutton filed for disability benefits with Prudential under both Policies A and C.

37. Prudential agreed that Dr. Sutton was disabled from September 2, 2013 through September 1, 2017 under the policies' "Own Occupation" definitions of disability and paid Plaintiff disability insurance benefits under these contracts accordingly.

38. Prudential terminated Dr. Sutton's claim on October 17, 2017.

39. When Prudential terminated Dr. Sutton's claim, the disability definition was that she must be unable to perform her "Own Occupation," or make at least 80% of Plaintiff's pre-disability earnings, or $240,000.

40. Dr. Sutton submitted an appeal on April 24, 2018.

41. Prudential reversed its termination on July 3, 2018 and agreed to extend her disability for the remainder of the "Own Occupation" periods on Plan A until October 1, 2018, and on Plan C until February 28, 2019. The letter gave Dr. Sutton the chance to appeal Prudential's decision that she was able to perform other "Gainful Occupations."

42. Dr. Sutton submitted additional information, including medical records, to show that she is totally disabled from the performance of her own and any other occupation as defined by the Policies, including evidence of continued impairment,

medical opinions of her inability to work, and ongoing diagnostic testing of additional diseases.

43. Despite having previously received this information, Prudential then asked for documentation of Dr. Sutton's earnings in 2013 to establish her Monthly Earnings for disability under the Gainful Occupation definition in the Plan.

44. Prudential asked for "payroll earnings statements and any and all profit and loss statements, for the period spanning from January 1, 2013 through June 30, 2013."

45. Dr. Sutton had already submitted this this information to Prudential in 2013 so that her claim would be approved.

Policy Terms

46. The definition of Disability under the previous 60 months required Prudential to consider Dr. Sutton's inability to earn 80% of her monthly earnings:

### *How Does Prudential Define Disability?*

> *You are disabled when Prudential determines that, due to your* **sickness** *or* **injury:**

- *you are unable to perform the* **material and substantial duties** *of your* **regular occupation\*;**

- *you are under the* **regular care** *of a* **doctor,** *and*

- *you have a 20% or more loss in your* **monthly earnings.**

47. The Policies also defined Monthly Earnings and Gainful Occupations as:

> **Monthly earnings** *means your average gross monthly income derived from your regular occupation, determined on the cash basis less expenses paid with respect to your regular occupation. It will be based on your average income during one of the 2 six-month periods that occurred immediately prior to your date of disability listed below:*

7

> *Period 1: January 1 to June 30*
>
> *Period 2: July 1 to December 31.*

**Gainful occupation** *means an occupation, including self employment, that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds the lesser of 80% of your indexed monthly earnings or $240,000 per year.*

48.  Because Dr. Sutton's disability began September 2, 2013, the Monthly Earnings period that initiated her claim under the original Own Occupation period relevant to her claim was *Period 1: January 1 to June 30.*

49.  To pay Dr. Sutton's claim for the entirety of the Own Occupation period, Prudential asked for and received her 2012 and 2013 tax returns.

50.  Dr. Sutton informed Prudential that she no longer had this information and requested that it obtain that information from the IRS.

Ongoing Denials, Appeals, and Partial Approvals

51.  Prudential repeatedly accused Dr. Sutton of not sending these documents or claiming that it could find the documents. On July 19, 2019, Prudential denied Dr. Sutton's appeal.

52.  Dr. Sutton appealed the denial on January 9, 2020, provided the requested documents and additional medical records establishing new qualifying conditions to support her continued disability from any Gainful Occupation.

53.  Prudential denied the appeal on June 18, 2020.

54.  Dr. Sutton submitted another appeal, attaching additional information, in

8

addition to signed medical records release authorizations for Prudential to continuously request updated medical information it needed to grant her claim.

55. Prudential claimed that it did not have the 2013 tax return, so it would look for other occupations earning 80% of her reported earnings ("$0"). Prudential claimed there was "no gainful threshold to assess her ongoing eligibility against."

56. Prudential determined that the material and substantial skills of a General Surgeon were applying logic, scientific information, and knowledge to diagnose and treat humans and animals who may be in pain or under stress; precise movement of eyes, hands, and fingers to perform surgical procedures; staying cool and calm during emergencies; and making critical decision and judgments.

57. Using these above skills, Prudential compared her experience as a General Surgeon to occupations as Clinical Reviewer, Utilization Review Coordinator, and an Admitting Coordinator/Officer. None of these had any relevancy to her career as a General Surgeon, nor were they within the wage qualifications listed in the Policies by review of her earnings.

58. Additionally, Prudential sent Dr. Sutton's medical records to its in-house reviewer, who opined that Dr. Sutton did not have any impairments that prevented her from being able to work in these occupations at the Sedentary level.

59. Prudential's medical record reviewer disregarded her functional limitations stemming from over nine surgical interventions Dr. Sutton endured from her injuries sustained from the 2013 car wreck, most recently on February 11, 2020.

9

In addition, Prudential's medical record reviewers suddenly found that Dr. Sutton's previously credible complaints were now non-credible, finding that she had the ability to work at the Sedentary level, work which Prudential previously agreed she could not do.

60.     Prudential's medical record reviewer also disregarded the updated information evidencing severe kidney damage, claiming that her condition of gadolinium poisoning was misdiagnosed by her treating physician, Dr. Richard Semelka. The medical record reviewer refused to address the symptoms of her physical condition objectively present in the medical evidence.

61.     Each time Prudential denied her claim, Dr. Sutton submitted an appeal on her own behalf by email. Throughout the process, she repeatedly explained to Prudential employees that she had problems typing, problems with her vision, was bed bound, and needed help to submit documents.

62.     One example was her September 9, 2020 email to Prudential employee Joseph Walles, where Dr. Sutton asked him to send a HIPAA release by email that she could e-sign, which would expedite the claim review process.

63.     Prudential's response was exemplified by Joseph Walles, who boldly proclaimed that "it is not our job to request our medical records".

64.     The longer the claim went on, the flimsier the reasons Prudential found to justify terminating the claim. One example came from its May 13, 2021 appeal denial letter, where it claimed for the first time that "we think your claim should not have

been approved" and alleged that Dr. Sutton did not work in 2012. However, Prudential went on, "we do not plan to address this in the future".[1]

65.  Prudential's confusing approach to claim terminations, appeals, and reversals was captured in a May 13, 2021 Claim Note by Mr. Walle, who explained, "new decision, gets 2 levels of appeal".

66.  Dr. Sutton submitted another appeal in May 2021.

67.  Prudential denied the appeal on September 16, 2021.

68.  Dr. Sutton submitted another appeal one day later.

69.  In reviewing Dr. Sutton's appeal, Prudential hired Exam Coordinators' Network ("ECN") to review some of her medical records. Either Prudential or ECN then selected Dr. Matthew Chan to review those records.

70.  Dr. Chan concluded that Dr. Sutton had absolutely no restrictions and limitations on working after October 2018. Going further, he determined that the severity of her condition was not supported by her medical records.

71.  Prudential paid ECN $2,828 for that cursory review.

72.  In October 2021, Dr. Sutton advised Prudential that, contrary to its representations, no one had contacted Dr. Semelka, her treating physician.

73.  As of April 2024, Prudential has still never contacted Dr. Semelka.

74.  Prudential hired ECN for another medical record review. This time, Prudential or ECN chose Dr. Derek Larson.

---

[1] This position directly conflicts its argument in its Motion to Dismiss Amended Complaint. [Doc. 21]. Regardless, Prudential cannot bring any counterclaim 11 years after approving the claim.

75.    On November 9, 2021 Dr. Larson concluded that there was no evidence whatsoever of Dr. Sutton's kidney disease. Going further, he concluded that "she does not have kidney problems".

76.    Dr. Larson is not a board certified nephrologist.

77.    On November 19, 2021, Prudential employee Christi Calloway performed a vocational assessment in which she determined that Dr. Sutton would work as an information clerk.

78.    On January 18, 2022, Prudential partially overturned its termination of the claim. In doing so, it approved benefits through June 2, 2019 and another period between February-March 2020. However, it found that she could work as an information clerk and denied the remainder of her claim.

79.    Dr. Sutton submitted another appeal that same day.

80.    On February 8, 2022, Prudential employee Kevin Carder and Dr. Dutton had a phone call. In that call. Dr. Sutton provided details about her kidney disease and its 70% mortality rate. She noted that Prudential seemed to use medical record reviewers who had no knowledge of gadolinium poisoning and Nephrogenic Systemic Fibrosis. She reminded Prudential that she suffered a stroke in 2019 and had vocal issues, which were noted during the call. She also explained that she could not read, had to have letters read to her, and could only see parts of letters. Dr. Sutton's cognitive issues were apparent to Mr. Carder, who had to repeat things which he had just said to Dr. Sutton.

12

81.  Days later, Dr. Sutton sent another signer authorization that would permit Prudential to get copies of her tax returns.

82.  On February 17, 2022, Kevin Carder demanded that Dr. Sutton undergo an Insurance Medical Examination ("IME"). She explained that, due to her medical condition, it was impossible to do so. She was confined to bed, required assistance for showering and food, and only left her house for monthly intravenous chemo infusions. Additionally, due to her use of oral steroids, she had an elevated risk of contracting COVID-19. She could not be vaccinated for COVID-19 due to a previous anaphylactic reaction to vaccines in her past, which led to intubation, ventilator support, and a stay in the ICU. As such, it was reasonable for Dr. Sutton not to "risk my life for another assessment".

83.  On February 22, 2022, Mr. Carder emailed Dr. Sutton that he was cancelling the IME.

84.  Between May and July 2022, Prudential paid R3 Continuum, Brown & Brown, and Reliable Review Services ("RRS") for additional medical record reviews. Prudential and/or R3 Continuum, Brown & Brown, and RRS chose Dr. Mark Kraus, Chad Obeid, and Howard Grattan to review some of Dr. Sutton's medical records.

85.  On June 9, 2022, Dr. Obeid concluded that Dr. Sutton had absolutely no restrictions and limitations.

86.  On July 7, 2022, Dr. Grattan concluded that Dr. Sutton's broken wrists were fully

healed after April 11, 2020, and that she could return to work following lumbar surgery.

87.   In June 2022, Dr. Sutton underwent urine tests that demonstrated an abnormally high level of gadolinium in her urine. The normal level of gadolinium is less than 0.8. Her reading was 46. She also had abnormally high levels of barium, cadmium, lead, and tungsten in her urine.

88.   By September 2022, Dr. Sutton had collapsed four different times from gadolinium syncope and underwent four different life saving resuscitations.

89.   As of April 2024, Dr. Sutton's left wrist remains dislocated and torn. It still requires surgery with 3-sided incisions to fuse and stabilize the left wrist.

90.   Prudential paid RRS at least $5,512 for Dr. Grattan's medical record review.

91.   Prudential denied Dr. Sutton's appeal on July 15, 2022.

92.   Dr. Sutton submitted another appeal.

93.   Prudential denied the appeal on August 22, 2022.

94.   On September 27, 2022, Prudential notified Dr. Sutton that she had finally exhausted all administrative remedies.

95.   In its final denial, Prudential discounted the opinions of Dr. Sutton's treating physicians, and the documented limitations from which she suffers, including the effects of her impairments on her ability to engage in all work activities.

96.   Prudential has ignored the disabling nature of her memory problems.

97.   Dr. Sutton has exhausted all administrative remedies.

14

98.    The Policy does not define "objective medical evidence".

99.    The Policy does not exclude subjective medical evidence.

100.    However, Prudential has created an artificial distinction between subjective and objective evidence that is not supported by the Policy.

101.    Prudential has relied on biased and unqualified medical record reviewers.

102.    All the evidence provided by Dr. Sutton showed that she met the Policy's definition of disability.

103.    Dr. Sutton has exhausted all administrative remedies.

Disabling Effects of Memory Problems

104.    In her appeals, Dr. Sutton repeatedly advised Prudential that it had ignored her consistent and repeated memory problems. They were, at least in part, caused by her stroke. They were regularly documented by her treating physicians and have only worsened with time.

105.    Given this context, Prudential had an obligation to carefully review the medical evidence and assess the downward trend in Dr. Sutton's cognitive abilities.

106.    Prudential ignored this evidence. Its medical director refused to pick up the phone and speak with any of Dr. Sutton's treating physicians. Instead, Prudential paid thousands of dollars to medical review companies for reports that supported its decision to terminate Dr. Sutton's claim, no matter what the evidence.

Prudential Ignores Subjective Evidence of Disability

107.    In denying Dr. Sutton's claim and appeals, Prudential stated there was a "lack of clinical data", or no objective medical evidence, of Dr. Sutton's disability. The term

15

"objective medical evidence" is not defined in the Policies. Courts have repeatedly rejected this artificial creation, whether it is found in policy language or simply grafted on *ex post facto*. An insurer cannot ignore subjective complaints of memory problems, and Dr. Sutton repeatedly pointed this out in her emails to various Prudential employees.

108.    Courts have found it unreasonable for an insurer to reject (1) a claimant's self-reported evidence where there is no basis for believing it to be unreliable; and (2) a treating physician's notes recording plaintiff's "self-reporting and subjective observations, or other assertedly 'subjective' evidence, where, as here, the applicable Plan does not restrict the type of evidence that may be used to demonstrate disability." *Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606 F. Supp. 2d 546 (W.D. Pa. 2009).

109.    In this claim, Prudential created an artificial distinction between subjective and objective evidence, and it ignored Dr. Sutton's repeated and consistent reports of memory problems. It does not directly accuse her of faking or lying about these conditions. Instead, it seems to contend that her treating physicians are lying or exaggerating Dr. Sutton's disability. This approach is exemplified by the June 9, 2022 medical review by Chad Obeid, who concluded that Dr. Sutton had absolutely no restrictions and limitations. It cannot do so.

Prudential Fails to Obtain Timely Evidence of Disability

16

110. Under the Policies, Prudential has a contractual right to have Dr. Sutton examined by a medical professional. However, it chose to wait almost nine years into the claim, during the height of a global pandemic, before asking Dr. Sutton to do so.

111. Dr. Sutton explained that, due to her medical condition, it was impossible to do so. She was confined to bed, required assistance for showering and food, and only left her house for monthly intravenous chemo infusions. Additionally, due to her use of oral steroids, she had an elevated risk of contracting COVID-19. She could not be vaccinated for COVID-19 due to a previous anaphylactic reaction to vaccines in her past, which led to intubation, ventilator support, and a stay in the ICU. As such, it was reasonable for Dr. Sutton not to "risk my life for another assessment".

112. As a fiduciary and insurer, Prudential has an obligation to look for coverage. This includes requesting appropriate tests and medical examinations when they are justified by the claim. When a claimant has suffered from memory problems for years, has suffered at least one stroke while on claim, and one of the sources of her disability is her memory problems, an examination is appropriate. Of course, the timing of an examination is just as important as the request itself.

113. The decision to conduct repeated "file-only" medical reviews can raise questions about the benefits determination, especially when the right to conduct a physical examination is specifically reserved in the Policies. Rather than pay thousands of dollars to medical review companies, Prudential could have asked Dr. Dutton to undergo an IME as far back as 2017. Its intentional delay in that request points to a desire to terminate the claim for its own benefit.

Social Security Disability File

114.  Dr. Sutton applied for Social Security Disability Income (SSDI) benefits.

115.  The Social Security Administration ("SSA") concluded that Dr. Sutton was disabled under SSA Guidelines. However, despite being requested to do so during the many appeals of her claim denial, and despite being authorized to do so, Prudential refused to obtain the actual SSDI file that evidences her disability. Prudential's actions in this regard highlight its desire not to have materials which would support an obligation to pay Dr. Sutton's claim, but rather to focus on reasons why the claim is not payable.

116.  It was wrong for Prudential to role of the ostrich with its head in the sand, sitting by passively. It had signed HIPAA authorizations from Dr. Sutton. It knew how to get the SSA file. The SSA file shows that Dr. Sutton is totally disabled from her own occupation. Prudential had an obligation to obtain the SSA file and fully and fairly review this evidence.

117.  Prudential violated its duty to Dr. Sutton by refusing to request the SSDI file, which would support her disability, which would require Prudential to pay her claim.

Prudential's Conflict of Interest

118.  Prudential is a fiduciary relating to the decision to pay claims for Dr. Sutton's Policies. Prudential has the fiduciary duty to treat claimants fairly and reasonably, conduct a full and fair review of claims, and act in claimants' best interests.

119.  However, Prudential operates under a structural conflict of interest inherent in its dual role as insurer and Claims Administrator. Not only is it the insurer of Dr.

18

Sutton's claim responsible for the payment of benefits, but its failure to pay this claim inures directly to its financial benefit. Prudential is motivated to deny this claim to obtain financial gain at the expense of Dr. Sutton and other similar claimants. Its motivation is financial, instead of an honest, objective adjustment of the claim in line with its fiduciary obligation. That financial gain is and has been obtained in various ways.

120.    Prudential reserves funds for pending claims. It reserved funds for Dr. Sutton's claim after she filed it, while it paid the claim, and it continues to reserve funds for her LTD claim. Those reserved funds are not idle but are instead invested as with other funds available to Prudential for additional revenue. Recognizing the likely long delay before a claim is resolved, Prudential enjoys the financial gain of the investment income and financial return as an additional source of revenue and profit. This is another example of its financial conflict of interest.

121.    But Prudential makes it even worse by providing its claims personnel, including those in claims management and those involved in the adjudication of Dr. Sutton's claim, with monetary incentives to delay payment or deny disability claims.

122.    Prudential's claims handlers are provided with metrics, including their own rates of approvals vs. denials, and their "productivity".

123.    Prudential employees get bonuses based on specific employee metrics contained in their semiannual and annual reviews. Some of them also get stock bonuses.

124.    In short, Prudential financially incentivizes its employees to deny disability claims, even if the claimant, like Dr. Sutton, is disabled.

19

125.    That conflict of interest and financial motivation to deny this claim was one of the motivations for Prudential to deny this claim.

Additional Evidence of Conflict – Medical Record Reviews

126.    On June 15, 2014, Prudential's internal vocational rehabilitation specialist, David Carey, M.Ed., CRC, CDMS, performed a paper review of Dr. Sutton's claim.

127.    On December 8, 2016 and October 17, 2017, Prudential's internal vocational rehabilitation specialist, LaToya Rodriguez, MS, CRC, performed paper reviews of Dr. Sutton's claim.

128.    On May 6, 2021 and November 19, 2021, Prudential's internal vocational specialist, Cristi Calloway, MS, LPC, CRC, performed paper reviews of Dr. Sutton's claim.

129.    On July 13, 2022, Prudential's internal vocational forensic specialist, Lindsay Neumann, MSEd., CRC, performed a paper review of Dr. Sutton's claim.

130.    On December 1, 2016, September 19, 2017, September 29, 2017, and October 7, 2017, Prudential's paid consultant, Joe Ordia, MD, reviewed some of Dr. Sutton's medical records.

131.    Dr. Ordia's reports and addenda are misleading, biased and result driven. He failed to review all relevant medical records. The reports ignore or are contrary to controlling medical authority. The reports fail to specify the medical standard upon which they rely. The reports are based on faulty or incorrect information.

132.    Dr. Ordia failed to consider all of Dr. Sutton's illnesses, alone and in combination. The reports are conclusory and results-driven, as demonstrated by the fact that they cherry-pick the information by overemphasizing information that supports

20

Prudential's position and de-emphasizing information that supports disability and the reports do not consider the standard of disability specified in the Policies.

133. On December 1, 2016, Prudential's paid consultant, Jerome Siegel, MD, reviewed some of Dr. Sutton's medical records.

134. His report is misleading, biased, and result driven. He failed to review all relevant medical records. The report ignores or is contrary to controlling medical authority. The report fails to specify the medical standard upon which it relies. The report is based on faulty or incorrect information.

135. Dr. Siegel failed to consider all of Dr. Sutton's illnesses, alone and in combination. The report is conclusory and results-driven, as demonstrated by the fact that the report cherry-picks the information by overemphasizing information that supports Prudential's position and de-emphasizing information that supports disability and the report does not consider the standard of disability specified in the Policies.

136. On June 26, 2018, July 8, 2022, August 15, 2022, and September 21, 2022, Prudential's paid consultant, Howard Grattan, MD reviewed some of Dr. Sutton's medical records.

137. Dr. Grattan's reports and addenda are misleading, biased, and results-driven in that he failed to review all relevant medical records, and the reports ignore or are contrary to controlling medical authority. They fail to specify the medical standard upon which they rely. The reports are based on faulty or incorrect information.

138. Dr. Grattan failed to consider all of Dr. Sutton's illnesses, alone and in combination. The report is conclusory and results-driven, as demonstrated by the fact that they

cherry-pick the information by over-emphasizing information that supports Prudential's position and de-emphasizing information that supports disability. The reports do not consider the standard of disability specified in the Policies.

139.   On December 21, 2020, January 8, 2021, and February 26, 2021, Prudential's paid consultant, Milton Klein, reviewed some of Dr. Sutton's medical records.

140.   With a pre-determined agenda to find Dr. Sutton not disabled, Prudential relies on biased reports from Dr. Klein.  Prudential in bad faith relies on a non-treating physician, who has not conducted a physical examination of Dr. Sutton, over her treating physicians who have examined Dr. Sutton over a long and frequent period of time and have more knowledge of her condition.

141.   On September 3, 2021, October 26, 2021, November 12, 2021, November 16, 2021, and November 24, 2021, Prudential's paid consultant, Matthew Chan, MD, reviewed some of Dr. Sutton's medical records.

142.   With a pre-determined agenda to find Dr. Sutton not disabled, Prudential relies on biased reports from Dr. Chan. His findings are inconsistent with record documentation of Dr. Sutton's eight spine surgeries from 2013 and 2019, which her treating neurosurgeons found necessary because conservative treatments like narcotics, physical therapy, heat, ice, rest, massage, and epidural injections were insufficient to mitigate her pain or restore her function. They are inconsistent with Prudential's finding that Dr. Sutton's spine condition was so functionally limiting as to prevent her from performing her occupation from 2013 to 2018, and from all but a few "sedentary" occupations thereafter. They are also inconsistent with the

22

opinions of Dr. Fix, Dr. Sutton's treating neurosurgeon, and Prudential's other medical consultants, all of whom found that Dr. Sutton's condition caused "chronic intractable multifocal spine pain with right upper and right lower extremity radicular pain/weakness" as recently as December 2020.

143.    On November 9, 2021, Prudential's paid consultant, Derek Larson reviewed some of Dr. Sutton's medical records.

144.    With a pre-determined agenda to find her not disabled, Prudential relies on a biased report from Dr. Larson. Prudential in bad faith relies on a non-treating physician, who has not conducted a physical examination of Dr. Sutton, over her treating physicians who have examined Dr. Sutton over a long and frequent period and have more knowledge of her condition.

145.    On May 17, 2022, May 20, 2022, August 11, 2022, and September 20, 2022, Prudential's paid consultant, Mark Krause reviewed some of Dr. Sutton's medical records.

146.    With a pre-determined agenda to find her not disabled, Prudential relies on biased reports from Dr. Krause. Prudential in bad faith relies on a non-treating physician, who has not conducted a physical examination of Dr. Sutton, over her treating physicians who have examined Dr. Sutton over a long and frequent period and have more knowledge of her condition. Dr. Krause's reports fail to consider the symptoms suffered by Dr. Sutton, instead choosing to argue her diagnosis is incorrect, without regard to the objective documentation of her limiting symptoms.

23

147. On June 9, 2022, August 15, 2022, and September 21, 2022, Prudential's paid consultant, Chadi Obeid, MD, reviewed some of Dr. Sutton's medical records.

148. With a pre-determined agenda to find her not disabled, Prudential relies on biased reports from Dr. Obeid. Prudential in bad faith relies on a non-treating physician, who has not conducted a physical examination of Dr. Sutton, over her treating physicians who have examined Dr. Sutton over a long and frequent period and have more knowledge of her condition.

149. There is some evidence that Prudential employees Jonathan Mittelman, M.D., Alison Baker, D.O., Thomas McDow, Melissa Perez, Kathleen Pattis, Melissa Hendrick, and Susan Pack reviewed Dr. Sutton's file, bit Prudential did not include those reports in its claim file.

## CAUSES OF ACTION

### Breach of the Insurance Contract

150. Dr. Sutton incorporates the preceding factual allegations.

151. The Policies were issued with an effective date of November 1, 2008.

152. The contract holder is TMAIT.

153. Policy A has a 30 day waiting period and $7,000 monthly benefit.

154. Policy C has a 180 day waiting period and $8,000 monthly benefit.

155. Prudential issued and insured both Policies A and C. The Policies jointly paid $15,000 per month if she was disabled.

156. The maximum benefit duration under both Policies is to the insured's Social Security retirement age.

157.  Dr. Sutton will reach her Social Security retirement age of 67 in May 2035.

158.  At all material times, the Policies were in full force and effect. All the premium payments were timely paid by Dr. Sutton.

159.  At all material times, Dr. Sutton has complied with all Policy provisions and conditions precedent to qualify for benefits before filing suit.

160.  In exchange for Dr. Sutton's continuing compliance with all Policy provisions and conditions precedent to qualify for benefits, Prudential owed Dr. Sutton a duty to pay her disability benefits monthly if she was disabled under the Policy.

161.  Dr. Sutton provided evidence that she met the elimination period.

162.  Dr. Sutton provided evidence that she met the Policy definition of disability.

163.  Prudential has never contended that Dr. Sutton's claim fit under a Policy exclusion.

164.  Prudential has never contended that Dr. Sutton's claim was subject to a limited pay period.

165.  Prudential has never asked Dr. Sutton to repay any part of her claim.

166.  Dr. Sutton provided Prudential with the information and evidence needed to properly pay her LTD claim.

167.  Prudential breached its duty under the Policies by refusing to pay the LTD claim after January 18, 2022.

168.  Prudential admits that on January 18, 2022, Dr. Sutton's benefits were extended through July 1, 2019 under both Plans A and C, which granted Dr. Sutton new appeal rights. [Doc. 21, p. 16; Doc. 21-4 at 10–12]. The extension was based on a conversation between Prudential's medical record reviewer and one of Dr. Sutton's

treating physicians during reconsideration of Prudential's decision to terminate her benefits under Plan A as of October 1, 2018 and under Plan C as of February 28, 2019.

169.    When Prudential expressly withdrew and changed its July 3, 2018 denial decision by extending benefits under Plans A and C for another eight and four months, that prior accrual-denial date (as characterized by Prudential) was nullified.

170.    At the earliest, Dr. Sutton's claims accrued on January 18, 2022, when Prudential reversed its prior denial and approved additional benefits through July 1, 2019.

171.    Prudential has breached the contract in the manner described in ¶4-119.

172.    Due to Prudential's breach, Dr. Sutton has incurred damages.

173.    The damages include the unpaid monthly disability benefits of $15,000 per month from 2018 through the present. Her damages are ongoing, as she remains disabled under the Policies.

## Breach of Duty of Good Faith and Fair Dealing

174.    Plaintiff incorporates the preceding factual allegations.

175.    Insurers have an affirmative common law duty of good faith and fair dealing. That means that in the handling and adjustment of a claim, the insurer is obligated to act in good faith and deal fairly with the policyholder in delivering on the promise of the policy. Prudential was obligated to meet this common law obligation once a claim on the policy was made.

176.    The guiding principles of proper claims handling help ensure the insurer meets this obligation. Claims handling personnel must be adequately trained on these

principles. These principles include an obligation to promptly acknowledge the claim, timely investigate the claim, and adjust that claim in a fair, objective, and non-biased manner.

177.    Timely adjustment and investigation of claims means seeking information and evidence to answer questions raised that may clarify the insurer's obligation to pay or deny the claim. Traditional claims handling principles also include a responsibility to find coverage, err in favor of the insured, resolve ambiguities and doubt in favor of the insured, and pay the claim if it meets the policy requirements for payment.

178.    An objective and thorough investigation includes inquiry into reasons to pay a claim, along with any reasons to deny the claim. The insurer must look at the positive and negative before making its claim decision. Claims decisions must be based on facts, not guesses or speculation. Artificial obstacles to payment, unreasonable interpretation of policy terms, speculation, outcome-oriented investigations, and bias should pay no role in delivery on its promise. In following these principles, the insurer is positioned to deliver on the promise of the policy. It is also positioned to meet its obligation of good faith and fair dealing.

179.    Prudential and its claims personnel failed to follow these claims handling principles. Its adjusters, on information and belief, lacked the requisite training to properly investigate and adjust this claim. They further failed to adjust this claim in a fair and equitable manner. They ignored their responsibility to find coverage or err or resolve doubts in favor of the insured and resolve ambiguities in favor of

the insured. They failed to investigate and evaluate this claim objectively and fairly. They merely looked for a reason to deny, ignoring reasons to pay the claim. Prudential was fully aware of and endorsed this conduct. In addition, Prudential and its adjusters failed to acknowledge Dr. Sutton's mental and physical condition and instead denied this claim solely based on guesswork and speculation.

180.    Throughout this claim, Prudential failed to acknowledge in its communications with Plaintiff that it had the affirmative duty to look for coverage, assist her with her LTD claim, and get the proper documents to determine if her LTD claim should have been approved. In fact, Prudential's approach was the exact opposite, as evinced by its refusal to obtain her tax returns, medical records, and the SSA file.

181.    Instead, Prudential presumably began and ended its investigation and adjustment of this claim with the approach evinced by biased employees like Alex Carrazana, Kimmura Chadwick, Jennifer Danforth, Alison Baker, Jennifer Martinovich, Kieran Shields, and Joseph Walles. It was exemplified by its payment of thousands of dollars to medical record reviewers instead of fully and fairly reviewing Dr. Sutton's claim. In doing so, it sought to find support for its conclusion that Dr. Sutton's claim should be terminated. This was the sole focus of any investigation Prudential undertook. It was an outcome-oriented focus seeking to find a reason for denial.

182.    In addition, Prudential treated this claim as if it were governed by ERISA, despite knowing that Dr. Sutton participated in the TMA Insurance Trust.[2]

---

[2] The TMA Insurance Trust is an insurance policy available only to physicians.

183.    Proper claims handling conduct requires the insurer, among other things, to work with the insured to find coverage. In this case, Prudential worked only to find reasons to deny claims and underpay claims. Coverage could have easily been found if Prudential fully and fairly reviewed the evidence submitted by Dr. Sutton from 2013-2023. Doing so would have led to only one conclusion: that her disability claim was covered. Prudential's liability as of the time of its denial was thus reasonably clear.

184.    This conduct was a breach of its common law duty of good faith and fair dealing. Prudential had a duty to investigate, evaluate, and adjust Dr. Sutton's claim fairly, objectively, and thoroughly. In this instance, its denial was made without any reasonable basis. At all material times, Prudential's liability was reasonably clear.

185.    Dr. Sutton relied on Prudential to investigate and adjust her claims in good faith honestly, objectively, and fairly. That reliance has been to her detriment. Prudential's breach of its common law duty of good faith and fair dealing instead caused Dr. Sutton to suffer considerable emotional distress and mental anguish. This conduct further caused injury and damage, for which she further sues.

## Violations of the Texas Insurance Code

186.    Plaintiff incorporates the preceding factual allegations.

187.    The Texas Insurance Code prohibits, among other things, certain activity by an insurer in the handling and adjustment of claims for policy benefits. Its focus is on the insurers claims handling conduct. Prudential, in its handling and adjustment of Dr. Sutton's claim, has engaged in just such prohibited unfair insurance claims

practices in violation of Chapters 541 and 542 of the Texas Insurance Code. These

unfair practices have also been committed knowingly. Prudential has committed,

*inter alia*, the following unfair claims settlement practices:

    i.  Misrepresenting material facts or policy provisions relating to the coverage at issue;

    ii.  Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the claim when its liability was reasonably clear;

    iii.  Failing to promptly provide to Dr. Sutton a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for its denial of a claim or offer of a compromise settlement of a claim;

    iv.  Failing within a reasonable time to affirm or deny coverage of a claim to Dr. Sutton;

    v.  Refusing to pay a claim without conducting a reasonable investigation of the claim;

    vi.  Knowingly misrepresenting to Dr. Sutton pertinent facts or policy provisions relating to coverage at issue;

    vii.  Failing to acknowledge with reasonable promptness pertinent communications relating to the claim arising under the policy;

    viii.  Making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact, and failing to state those material facts necessary to make other statements made not misleading, considering the circumstances under which the statements were made; and

    ix.  Engaging in this conduct knowingly with actual knowledge of the falsity, unfairness, or deception of these foregoing acts and practices.

188.  These provisions of the Insurance Code are intended to protect insurance

consumers from misleading or false statements about the policy or claim or compel

the insurer to disclose material facts to avoid misleading the consumer. They are

30

also intended to compel the insurer to promptly resolve claims when liability is reasonably clear. Prudential violated these provisions of the Insurance Code.

189. One example of Prudential's misrepresentations was its promise that Dr. Sutton would receive monthly benefits if her physical or mental condition prevented her from performing the duties of any gainful occupation that she was reasonably fitted by education, training, and experience. In reality, Prudential failed to pay those benefits when the evidence represented her qualifications and claimed that it required "conclusive proof" of her condition, when no such requirement in the policies existed.

190. Another example of Prudential's misrepresentations was its offering of these policies to the physicians engaged with the Texas Medical Association, promising coverage over the claimants' inabilities to perform gainful work while injured and limited in the performance of their activities of daily living, all while collecting premiums without intent to fully pay out claims made by the same, and subjecting claimants to predetermined examinations and peer reviews under the guise that any endorsement of their disabilities would be taken into consideration and not readily dismissed by Prudential's paid experts.

191. Another example of Prudential's misrepresentations was its repeated claim denials, requests for information already in its possession multiple times throughout the claim process, alleging it did not receive information submitted to its offices, failing to engage in proper procedure as it reviewed Dr. Sutton's claim, hiring biased employees to deny claims based on an incentivized profit-driven

31

agenda, paying for biased and unqualified medical reviews, failing to describe to Dr. Sutton what policy provision is relied on initially in its denials, and requiring heightened proof of Dr. Sutton's claim not described in the Policy.

192. Another example of Prudential's misrepresentations was when it advised Dr. Sutton that it needed the actual SSA file before it could determine if her SSDI claim supported her LTD claim. However, despite being requested to do so during the appeal of her claim denial, and despite being authorized to do so, Prudential refused to obtain the actual SSDI file that evidences her disability. Prudential's actions in this regard highlight its desire not to have materials which would support an obligation to pay Dr. Sutton's claim, but rather to focus on reasons why the claim is not payable.

193. Another example of Prudential's misrepresentations was its misrepresentation of its policy terms, including the requirements under the provisions noted in Dr. Sutton's determinations. The Gainful Occupation provision relates to work reasonably related to a claimant's own occupation, not random skills that the own occupation may have entailed, nor by any financial threshold it deems appropriate. Prudential questioned Dr. Sutton's credibility without any information suggesting any of her recorded treatment was improper, unreasonable, or untrue. Dr. Sutton's complaints are wholly supported by the claim file, yet Prudential asserts a functional capacity directly opposing the ones it previously assigned.

194. Another example of Prudential's misrepresentations was its refusal to advise Dr. Sutton that it had the affirmative duty to look for coverage, assist her with her

disability claim, and get the proper documents to determine if her LTD claim should have been approved.

195.    Any claim by Prudential that it received no information to support the claim would be untrue. Dr. Sutton provided Prudential all the information available. Even if Prudential believed it had no information to support the claim, as a part of its duty to investigate and perform a reasonable investigation, it was obligated to inform its policyholder what specific information it needed to perfect their claim. It failed to do so. Any investigation Prudential undertook cannot be reasonable or thorough without at least, under these circumstances, asking Dr. Sutton for any information she might have to support her claim. Given Dr. Sutton's disability, and her repeated emails to Prudential employees letting them know that she had vision and writing problems, it knew it had easier ways to obtain the records it requested. Instead, it kept pounding away at Dr. Sutton, hoping that she would give up.

196.    Prudential further misrepresented that it would obtain Dr. Sutton's medical records once it had a signed HIPAA authorization from her. In reality, it did not obtain the medical records from all of her treating physicians, even though she provided their information and a signed HIPAA authorization.

197.    At no time before this suit was filed did Prudential make any attempt, in good faith or otherwise, to settle Dr. Sutton's claim. Though it received the appeal, which clearly and unequivocally stated the facts in support of coverage of the claim, Prudential chose to ignore the facts. It chose to ignore the evidence. It chose to ignore the equitable bases for coverage. Its liability was reasonably clear. However,

Prudential has not offered a penny to settle this claim before litigation. Failing to try to settle this claim promptly, fairly, and equitably was a further violation of the Insurance Code provisions.

198. The statements described above were misleading and were material, and they made it impossible for Dr. Sutton to know if Prudential had all the evidence that supported her claim. These statements were intended to mislead and did mislead Dr. Sutton to a false conclusion about the material facts related to the coverage at issue.

199. At all material times, Prudential's conduct in this regard was intentional. It knowingly engaged in this conduct. It knew it had no factual basis upon which to deny Dr. Sutton's claims. Instead, it intentionally chose to ignore the factual and legal evidence provided by Dr. Sutton. It chose to parrot its flawed reasoning, perform no investigation, not offer a single penny, and hope that Dr. Sutton would simply go away.

200. This conduct, along with Prudential's other acts and omissions, violated Texas Insurance Code §§541.001, et seq., 542.001, et seq., including the Insurance Code's provision for the prompt payment of claims, §542.051, et seq.

## Knowing Conduct

201. The conduct complained of in this action was engaged in knowingly, as that term is defined in Ch. 17 of the Texas Business and Commerce Code and Tex. Ins. Code §541.001(1). Prudential knew what it was doing. It knew its claims handling conduct violated provisions of the Texas Insurance Code. It knew its medical

34

director and employees were biased and unqualified. It knew of its false, misleading, and deceptive nature conduct in handling this claim.

## Damages

202. Prudential's acts, omission, and practices constituting a tort were the proximate cause of Plaintiff's damages. All of Prudential's acts and practices in violation of the various statutes herein recited were the producing cause of Plaintiff's actual damages, including, but not limited to, damages for mental anguish and emotional distress, as well as actual damages under the insurance contract. For these wrongful acts, omissions, and practices, Plaintiff is entitled to money damages as may be found by the jury.

203. The acts, omissions, and practices of Prudential constituting a tort herein warrant the imposition of 18% per annum pursuant to Tex. Ins. Code §542.060, *et seq*.

204. Prudential's actions in handling of Plaintiff's claim were done knowingly and intentionally, or with a conscious or callous disregard for Dr. Sutton's rights and welfare. As such, its actions reflected gross negligence and were so outrageous as to warrant the imposition of punitive or exemplary damages, for which Plaintiff further sues for recovery. Plaintiff seeks such punitive or exemplary damages as may be assessed by the jury in its discretion.

205. Plaintiff also requests, in addition to the benefits withheld, prejudgment interest on any such award. she is entitled to prejudgment interest as additional compensation, and pursuant to Tex. Ins. Code §1103.104, or on principles of equity.

## Request for Attorneys' Fees

206. This suit was made necessary by Prudential's wrongful acts and practices. Plaintiff has been forced to retain attorneys to prosecute her claims, for which she has agreed to pay a reasonable attorneys' fee. In this regard, she is entitled to recover her reasonable attorneys' fees and expenses incurred and to be incurred in this action for the full prosecution of this claim through trial and appeal, if any, that are reasonable and necessary for her to obtain the relief she seeks. Accordingly, Plaintiff further seeks recovery of her reasonable attorneys' fees incurred and to be incurred in the prosecution of this action pursuant to pursuant to Section 38.001, *et. seq.* of the Texas Civil Practice and Remedies Code,  Ch. 541 and 542 of the Texas Insurance Code, Section 17.49 *et seq.* of the Business and Commerce Code, and any other applicable Texas law.

## General Claims

207. All notices required to be given have been given, and all conditions precedent have been satisfied.

208. Plaintiff requests prejudgment interest at the maximum rate permitted by law, including that permitted pursuant to Tex. Ins. Code §542.060 and §1103.104(c), or the maximum rate permitted in equity.

## Demand for Jury Trial

209. Plaintiff demands a jury trial.

## Prayer

36

For these reasons, Plaintiff requests Prudential be cited to appear, and on final trial, Plaintiff obtain a judgment against Prudential in an amount in excess of the minimum jurisdictional limits of this Court, Plaintiff be awarded judgment against Prudential for the above described damages in the full amounts allowed by law, together with statutory interest, reasonable attorneys' fees incurred herein, pre-judgment and post-judgment interest at the maximum rate allowed by law, costs of court, and all such other and further relief, both at law and in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

By: */s/ Amar Raval*
            Amar Raval, TBA #24046682
            Berg Plummer Johnson & Raval LLP
            3700 Buffalo Speedway, Suite 1150
            Houston, Texas 77098
            (713) 526-0200
            (832) 615-2665 (Fax)
            araval@bergplummer.com

            ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument was served electronically, by e-filing, by first-class mail, by certified mail return receipt requested, by email, or by fax on April 17, 2024 as follows:

Julie M. Kamps
Ian Morrison
Seyfarth Shaw LLP
233 S. Wacker Dr., Suite 8000

Chicago, IL 60606
jkamps@seyfarth.com
imorrison@seyfarth.com

Esteban Shardonofsky
Seyfarth Shaw LLP
700 Milam St., Suite 1400
Houston, TX 77002
sshardonofsky@seyfarth.com

_/s/ Amar Raval_
Amar Raval